**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PAMELA M. NOWAK,

                        CIVIL ACTION NO. 16-10506

       *Plaintiff*,            DISTRICT JUDGE AVERN COHN
*v.*                          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 9, 10)**

## I.     RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Nowak is not disabled. Accordingly, **IT IS RECOMMENDED** that Nowak's Motion for Summary Judgment (Doc. 9) be **DENIED**, the Commissioner's Motion (Doc. 10) be **GRANTED**, and that this case be **AFFIRMED**.

## II.     REPORT

### A.     Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 2). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 10).

On June 17, 2013, Plaintiff Pamela Nowak filed an application for DIB, alleging a disability onset date of April 9, 2009. (Tr. 135). The Commissioner denied her claim. (Tr. 54-57). Nowak then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on July 29, 2014, before ALJ Timothy Scallen. (Tr. 23-42). At the hearing, Nowak, represented by her attorney, Kerry Spencer testified, alongside Vocational Expert ("VE") Elizabeth Pazowsky. (*Id.*). On September 23, 2014, the ALJ found Nowak not disabled. (Tr. 10-19). On January 12, 2014, the Appeals Council denied review. (Tr. 1-3). Nowak filed for judicial review of that final decision on February 2, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

2

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than [twelve]
> months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).    The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment
> or combination of impairments that "significantly limits . . .
> physical or mental ability to do basic work activities," benefits
> are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial
> gainful activity, has a severe impairment that is expected to last
> for at least twelve months, and the severe impairment meets or
> equals one of the impairments listed in the regulations, the
> claimant is conclusively presumed to be disabled regardless of
> age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past
> relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

**D.    ALJ Findings**

Following the five-step sequential analysis, the ALJ found Nowak not disabled under the Act. (Tr. 19). The ALJ found at Step One that Nowak had not engaged in substantial gainful activity following the alleged onset date.[1] (Tr. 12). At Step Two, the ALJ concluded that Nowak had the following severe impairments: "scoliosis of the dorsal spine, loss of lordotic curve, osteoarthritis of the spine and vitamin D deficiency." (Tr. 12-14). At Step Three, the ALJ found that Nowak's combination of impairments did not meet or equal one of the listed impairments. (Tr. 14). The ALJ then found that Nowak had the residual functional capacity ("RFC") to perform light work, except with additional limitations as follows:

> Occasional climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; avoid concentrated exposure to unprotected heights or moving machinery.

(Tr. 14-19). At Step Four, the ALJ found that Nowak could perform her past relevant work as a medical assistant despite her ailments. (Tr. 19). The ALJ therefore did not proceed to Step Five because the matter was resolved at Step Four.

### E.    Administrative Record

### 1.    Application Reports and Administrative Hearing

The Court has reviewed Nowak's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

---

[1] The Commissioner notes that the ALJ incorrectly listed Nowak's alleged onset date as April 1, 2009, instead of the actual alleged onset date, April 9, 2009. (Doc. 10 at 2 n. 2). Neither party alleges that this error caused any prejudicial effect on Nowak's claim for benefits. The Court thus finds that this error is immaterial and harmless, and requires no further consideration.

2.        **Application Reports and Administrative Hearing**

a.        **Function Report**

Nowak completed a function report on April 12, 2013. (Tr. 115-122). She complained of a rapid decline in her health beginning in October 2008. (Tr. 115). Around that time she began feeling a reduction in strength, and that "on a good day [she] might feel well enough to do chores around the house for about [four hours]." (*Id*.).  On a "good day" she experienced "a low pain level," but noted that she spends "most" of her days "in pain and fatigue." (*Id*.). She reported being "too weak to work at [her] hold job or to keep up with the usual everyday things required of a wife and mother." (*Id*.). She expressed a desire to return to her "old life." (*Id*.). Nowak sometimes felt too tired to open a bottle and sometimes "can't move." (*Id*.).

Nowak described her average day as involving waking up mid-day, taking medications, making coffee and a light breakfast, watching the news, and waiting for her "meds [to] start helping." (Tr. 116). Once her medications kicked in, Nowak was able to "clean up the kitchen and laundry, straighten or clean a little for about [two and one half hours.]" (*Id*.). She spent the remainder of the day talking on the phone or watching television, and went to bed at around 8:00pm. (*Id*.). Nowak also noted that she was "thankful that people who make medicine for the sick – truly a gift from the Lord." (*Id*.).

Nowak reported cleaning the house and doing laundry to help her husband and son, but she "wish[ed she] could do more." (Tr. 116). Nevertheless, Nowak wrote that she did not provide care for other people or animals. (*Id*.). She wrote that prior to her illness she was able to "work full time in a walk-in clinic – which [she] loved." (*Id*.). She noted that

she was "excellent at [her] job and loved the patients. [She] was supermom and wife . . . it seemed like nothing could stop [her]." (*Id*.).'

Nowak needs "to get a lot of sleep to feel well," and finds that without sleep she is "toast." (Tr. 116). She described a struggle with insomnia, and took several medications to aid in sleep. (*Id*.).

As to personal care, Nowak wrote that it took her one and one half hours to "get totally dressed," which she found exhausting. (Tr. 116). She took roughly three showers weekly. (*Id*.). Nowak found that eating was sometimes difficult, particularly when alone, though she did not describe the cause of this struggle. (*Id*.). She found managing her hair "exhausting." (*Id*.). She likewise found shopping for personal products tiring. (*Id*.).

As to meals, Nowak ate yogurt, oatmeal, toast, protein bars, and fruit, *i.e.* simple meals with little or no preparation. (Tr. 117). Preparing these foods took twenty to thirty minutes, and she did so daily. (*Id*.). Nowak found that eating unhealthy foods made her feel "weaker." (*Id*.).

As to chores, Nowak stated that she emptied her dishwasher, cleaned dishes, emptied trash cans, and washed laundry "when [she] ha[s] energy." (Tr. 117). She spent about two and one half hours daily performing these chores "unless [she is] bed ridden and can't do much." (*Id*.).

Nowak reported that she will frequently "cry out" to her husband about her pain, and that he comforts her. (Tr. 117). Likewise she derives comfort from her "church family" via "phone calls and cards." (*Id*.).

Nowak explained that the "only reason [she does] not do yard work," which she "love[s]," is because she has only about two to six hours per day in which she feels well. (Tr. 118). She finds this limitation to be "very frustrating," and finds it necessary to perform indoor chores like cleaning dishes and laundry first." (*Id.*).

Nowak also reported sitting outdoors daily to obtain sunlight on recommendation of her physician. (Tr. 118). She is able to drive a car and can go out alone, but sometimes requires accompaniment when weakened by neuropathy.[2] (*Id.*).

Nowak shopped only to obtain medicines for thirty minutes monthly, and otherwise left shopping to her husband and son. (Tr. 118). She was able to pay bills and handle money, and reported that her ailments had no impact on these abilities (Tr. 118-19).

Nowak's hobbies included reading, following the news, and assisting (in limited degree) her husband to plant flowers. (Tr. 119). Prior to her illnesses she was "super strong" and could perform all household activities. (*Id.*).

Nowak sometimes received visits from friends and family who brought her dinners, snacks, and gifts. (Tr. 119). She spent much time on the phone, and attended church three times weekly with some difficulty. (*Id.*). Once weekly she taught sixth graders at her church, but often left early due to a lack of energy. (*Id.*). She had no difficulty getting along with others, but found herself unable to participate in many "pastor wife duties" due to health issues. (Tr. 120). In an attached letter she noted that she sometimes "visits . . . hospitals to see the sick or the dying" in her role as a pastor's wife. (Tr. 124).

---

[2] The Court was unable to find any reference to neuropathy in Nowak's medical records. Dr. Bunney's May 2014 opinion makes no reference to that condition. (Tr. 334-35).

Nowak reported difficulty squatting, bending, lifting, walking, sitting, kneeling, climbing, seeing, remembering, completing tasks, concentrating, and using her hands. (Tr. 120). She complained that her osteoarthritis had worsened substantially, limiting her ability to move and causing her to feel "like an old lady." (*Id.*).

Nowak could walk for "maybe a couple blocks" without stopping, and could return to walking after "a few minutes." (Tr. 120). Her ability to walk was limited by her pelvic and lower back pain, amongst other issues. (*Id.*).

Nowak could pay attention for "several hours when feeling well." (*Id.*). She generally finished what she started, with the exception of chores. (*Id.*). She experienced some difficulty with following written and verbal instructions, and sometimes required that statements be reiterated multiple times before making sense. (*Id.*).

Nowak's ailments somewhat limited her ability to deal with stress. (Tr. 121). She could handle changes in routine provided she "ha[d] the strength to keep up." (*Id.*). Finally, she noted that she took Neurontin for pain, which had the side effect of nausea, and Prozac for her mental wellness, which induced melancholy. (Tr. 122).

### b.    Nowak's Testimony at the Administrative Hearing

At the hearing before the ALJ, Nowak asserted that she last worked in April 2009 as a medical assistant at a walk-in clinic. (Tr. 26). She worked twelve hour shifts daily for "about 11 years." (*Id.*). Nowak asserted that she began feeling ill in 2008, and that her physician's attempts to treat her weakness were unavailing. (*Id.*). She found it difficult to perform her basic duties as a medical assistant, and ultimately found that she was unable to perform that job despite her employer's accommodations. (Tr. 27).

9

Nowak described her pain as feeling like "glass throughout [her] entire body." (Tr. 28). She also attested to constant fatigue, and described her pain as a "12" on a "zero to 10" pain scale, with ten causing the feeling that one must "go to the hospital." (*Id*.). Nowak used Neurontin beginning in 2009, and found that the medication helped to mitigate some of her pain, but also caused the side effects of dry mouth, dizziness, fever, melancholy, heart burn, dizziness, blurry vision, and caused difficulty thinking. (Tr. 29).

Nowak stated that her neck "hurts all the time," and bewilderingly compared her neck pain to the collapse of the World Trade Center Towers on September 11, 2001, stating that "like the Twin Towers how they fell, it feels like my neck sort of crash [sic] all the time.[3]" (Tr. 29-30).

Nowak complained of memory issues, stating that she often reverses numbers and directions. (Tr. 30). Nowak testified that she had not driven for the last month, and was driven to the hearing by her daughter. (*Id*.).

Nowak stated that she could lift perhaps ten or fifteen pounds for a short period of time, and asserted that this pain was the result of degenerative disc disease of the lower spine. (Tr. 31). Nowak also complained of restless leg syndrome and back pain which limited her ability to sit. (*Id*.). She could stand for approximately twenty minutes at a time. (Tr. 32). She could walk for about two blocks before resting. (Tr. 33).

---

[3] This analogy is largely inscrutable. It is unclear from the record precisely what Nowak could have meant in asserting that her neck crashes like a collapsing tower. As discussed below, the medical record contains little evidence of complaints regarding neck pain.

Nowak described experiencing about four "bad days" per week. (Tr. 32). On her "bad days" she would wake up around 3:00pm and spend most of the day lying in bed, watching television. (*Id*.). On a "good day," Nowak could wash dishes, clean the laundry, prepare a "nicer" meal, including a dessert "from a box." (Tr. 36). Nowak stated that she was able to attend church on Sunday mornings, but was "only good for six hours," and found it necessary to return home around 3:00pm. (*Id*.).

Nowak stated that she had great difficulty bending over, but did not testify to difficulties with other postural activities such as kneeling, crouching, or crawling. (Tr. 34). She had no difficulty extending her arms outward. (*Id*.).

Nowak described approaching chores around the house slowly, doing a bit of work between television advertisements. (Tr. 35). Nowak's husband usually made the meals for the family, or she made "very simple meals." (*Id*.). She received assistance from her son in sorting and washing the laundry. (*Id*.).

### c.  The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Nowak's ability to perform work. (Tr. 38). The VE characterized Nowak's past relevant work as a medical assistant as skilled work performed at the light level of exertion. (Tr. 38-39).

The ALJ then asked the VE a series of hypotheticals to determine Nowak's ability to perform work. The ALJ first asked the VE to imagine a worker with Nowak's age, education, and work experience, and who is capable of performing light work, but who is further limited to occasional climbing of stairs and ramps; no climbing of ropes, ladders, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and who

should not be exposed to concentrated exposure unprotected heights or moving machinery. (Tr. 39). The VE testified that such a worker could perform Nowak's past relevant work as a medical assistant. (*Id*.). The ALJ then asked whether a worker who was also limited to the performance of simple, routine, repetitive tasks could perform Nowak's past work – the VE found that they could not. (*Id*.). Likewise, the VE found that a worker limited to work at the sedentary level could not perform Nowak's past relevant work. (*Id*.). However, the VE found that a worker so limited could nevertheless perform several jobs available in the national economy. (Tr. 40).

The VE also attested that employers permit ten to twenty minute breaks twice daily, and twenty minutes to an hour for lunch. (Tr. 40). Absenteeism is permitted once or twice per month after a two month "break-in period." (*Id*.). A worker who takes a larger number of breaks per day, or is absent more frequently per month, would not be able to find work. (Tr. 41).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B).       The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.    Both   "acceptable"   and   non-

acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions

entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Hammond v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding

a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Hammond v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective

evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming

evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any
        medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . .
pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's

work history and the consistency of his or her subjective statements are also relevant. 20

C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he [or she] furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5.

The RFC "is the most he [or she] can still do despite his [or her] limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

A hypothetical question to the VE is valid if it includes all credible limitations developed

prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D.

Mich. Dec. 9, 2009).

**G.     Analysis**

16

Nowak argues that the ALJ erred in five ways: 1) Granting insufficient weight to Nowak's treating physician; 2) Failing to recontact Dr. Bunney; 3) Finding that fibromyalgia was not a severe impairment; 4) Rendering an improper credibility determination; 5) Presenting questions to the VE which did not fully encompass Nowak's limitations. These arguments will be addressed in turn.

### 1.      The ALJ Granted Appropriate Weight to Nowak's Treating Physician

Nowak first argues that the ALJ erred by granting too little weight, which is to say no weight, to the opinion of her treating physician, Dr. Noor Bunney. (Doc. 9 at 13-16). Dr. Bunney wrote in May 2014 that he first treated Nowak in September 1998. (Tr. 334-35). Nowak was employed by Dr. Bunney throughout her work history, and continued to treat with him after leaving his employ. (Tr. 101-02, 132).

The ALJ concluded that Dr. Bunney's opinion was "not unbiased" due to his status as Nowak's former employer. (Tr. 18). The Commissioner argues in her brief that this analysis is a good reason to discount Dr. Bunney's findings, but provides no case law in support of that conclusion. (Doc. 10 at 5-6, 8). Good arguments could be made that Dr. Bunney's employer-employee relationship with Nowak either increases or decreases the reliability of his opinion. The "treating physician rule" provides that the opinions of a treating physician, when well-supported by the evidence of record, are entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(2). The logic underlying this rule is that "the treating physician knows the patient better, and consequently has a greater insight into the true parameters of the patient's status." *Overton v. Astrue*, No. CV 10-02724 RZ, 2010

WL 5363000, at *2 (C.D. Cal. Dec. 20, 2010). Because Dr. Bunney knows Nowak both as a patient as an employee, he has perhaps the clearest picture of Plaintiff's health and the impact of her ailments upon her ability to perform work. On the other hand, a physician who both employed and treated a claimant might be expected to have a closer relationship with that person, and thus have a greater incentive to inflate the severity of that person's symptoms. In any case, the Court finds that there are ample other reasons for discounting Dr. Bunney's opinion in this matter, thus the ALJ's rejection of his opinion need not rest on this ground. Insofar as the ALJ erred by discounting Dr. Bunney's opinion because it was not unbiased, that error was harmless.

The ALJ also concluded that Dr. Bunney's generally unremarkable clinical findings did not support the severe degree of restriction included in his opinions. (Tr. 18). Specifically, the ALJ noted "intact neurological function, strength and sensation" throughout Dr. Bunney's notes. (*Id.*). The ALJ also chronicled Nowak's condition throughout her treatment with Dr. Bunney, noting intermittent complaints of pain and tenderness from 2008 through 2013, and an otherwise normal condition. (Tr. 15-18). By way of comparison, Dr. Bunney opined in May 2014 that Nowak could walk for three hours daily, and only one hour at a time; that she did not require the use of a cane; could sit without restriction; required unscheduled breaks every two hours for fifteen minutes each; would miss more than four days of work per month; and that she could frequently look down, turn her head, look up, hold her head in a static position; occasionally twist and stoop; and rarely crouch or climb. (Tr. 338-39). He further concluded that Nowak's pain

would "constantly" interfere with her pain, and that her symptoms were reasonably consistent with her impairments. (Tr. 339).

Nowak contends that Dr. Bunney's opinion is fully consistent with the other evidence of record. (Doc. 9 at 13). Nowak argues that her impairment of fibromyalgia, an "elusive and mysterious disease," explains why relatively few objective findings support her claims of pain. (*Id.*). Nowak is correct that fibromyalgia is unusual amongst chronic ailments because it is not amenable to objective confirmation. The Sixth Circuit has noted that fibromyalgia produces "'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.3 (6th Cir. 2007) (quoting Stedman's Med. Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005)). "[T]he absence of objective medical evidence to substantiate the diagnosis of fibromyalgia or its severity is basically irrelevant, and more 'aggressive' treatment is not recommended for fibromyalgia patients." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011).

Fibromyalgia may be found if the claimant experiences "[a]t least 11 positive tender points on physical examination . . . bilaterally." SSR 12-2p; Titles II & Xvi: Evaluation of Fibromyalgia, SSR 12-2P (S.S.A. July 25, 2012). The Commissioner asserts that Dr. Bunney's notes do not contain any reference to tender points, and thus made no attempt to diagnose fibromyalgia. (Doc. 10 at 11). Nowak counters that fibromyalgia can also be diagnosed via "part B" criteria, as described in the criteria list established by the American Criteria of Rheumatology. (Doc. 11 at 4). As codified in SSR 12-2p, the Commissioner "may find" that a person has fibromyalgia where they suffer from a) "[a] history of

widespread pain . . . in all quadrants of the body . . . for at least 3 months . . . [which] may fluctuate in intensity and may not always be present," and b) "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome[4]," and there is c) "[e]vidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded." SSR 12-2p.

Nowak makes only a passing effort to demonstrate that she meets these part B criteria. She merely notes that her medical record shows that she was given "countless pain medications over the years," "has been noted to have insomnia, anxiety, depression, memory issues," and that "[a] longitudinal review of her records is consistent with the diagnosis of fibromyalgia." (Doc. 11 at 4). Nowak does not point to evidence that she experienced widespread pain in all quadrants of her body, nor that she experienced repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, nor that other conditions were ruled out. Taking Nowak at her word that she experienced

---

[4] "Somatic symptoms that might be considered: muscle pain, irritable bowel syndrome, fatigue/tiredness, thinking or remembering problem, muscle weakness, headache, pain/cramps in the abdomen, numbness/tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives/welts, ringing in ears, vomiting, heartburn, oral ulcers, loss of/change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, painful urination, and bladder spasms."

The American College of Rheumatology Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity, https://www.rheumatology.org/Portals/0/Files/2010_Preliminary_Diagnostic_Criteria.pdf, last visited November 22, 2016. "Other co-occurring conditions, which are not listed in Table No. 4, may also be considered, such as anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." SSR 12-2p.

anxiety, depression, and memory issues, she has still failed to meet any of the three criteria necessary to diagnosis of fibromyalgia under the part B analysis. Indeed, the record indicates a paucity of evidence regarding Nowak's alleged fibromyalgia, including a note by examining physician Dr. Jose Jurado that Nowak's family physician told her that she "may" suffer from fibromyalgia. (Tr. 313).

The restrictions pronounced by Dr. Bunney, including that Nowak would miss more than four days of work monthly, could walk for only three hours daily, and that her pain would constantly interfere with her ability to concentrate, should be given controlling weight insofar as they are well supported by evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2). As noted by the ALJ, review of the totality of the medical record simply does not support these extreme limitations.

Throughout the record, Dr. Bunney notes the possibility that Nowak suffered from fibromyalgia, but did not record any testing which might have confirmed that suspicion. *See, e.g.*, December 2008 "Fibromyalgia . . . Pain is much better than before" (Tr. 177); January 2009 "fibromyalgia, slightly uncontrolled" (Tr. 174); February 2009 "patient presented complaining of symptoms of fibromyalgia. Says she is feeling slightly more pain then [sic] before" (Tr. 171); April 2009 "patient presented complaining of symptoms of . . . fibromyalgia" (Tr. 162); July 2009, "she has a problem with fibromyalgia" (Tr. 161); August 2009 "presented with symptoms of fibromyalgia" (Tr. 159); September 2009 "rule out . . . fibromyalgia" (Tr. 158); November 2009 Nowak "presented complaining of symptoms of a history of fibromyalgia, arthritis . . . and insomnia." (Tr. 155).

Where Dr. Bunney does provide some level of detail about Nowak's condition, it is often wholly insufficient to determine her degree of functional limitation. In November 2008, Dr. Bunney wrote "[p]atient presented complaining of symptoms of multiple joint pain." (Tr. 181), and in December 2008 he wrote that "[p]atient presented with symptoms of her pain coming back. The Lexapro is not helping her." (Tr. 180). In August 2010 Dr. Bunney examined Nowak's head, eyes, ears, nose, throat, neck, chest, heart, abdomen, extremities, skin, neurological status, and ran an electrocardiogram. (Tr. 275). Study of a patient's abdomen and extremities might assist in diagnosis of fibromyalgia, but Dr. Bunney's notes provide only that Nowak's abdomen was "Soft. Not tender. No organomegaly. No palpable mass. Bowels sound normal. No bruits." (*Id*.). As to extremities, he wrote only that no edema was noted. (*Id*.). This examination data provides no basis on which to determine that Nowak suffers from fibromyalgia, nor to determine the severity of that condition.

Where Dr. Bunney provides some useful detail about Nowak's condition, it almost invariably is presented without contextual information which could help to gauge the severity of Nowak's condition. For example, in March 2012 he wrote that Nowak "is still having pains and aches and she is taking 300 mg three times a day of Neurontin and it's not enough" (Tr. 241), but does not specify where that pain was occurring, nor any details about how Nowak described the pain (*e.g.* stabbing, shooting, aching). Likewise, in May 2010 Nowak presented complaining of "fatigue, tired, and has a history of insomnia and lunesta is not working for her." (Tr. 283). In the "impression" section, Dr. Bunney diagnoses insomnia, anxiety, and fibromyalgia. (*Id*.). No findings from that visit support a

22

diagnosis of fibromyalgia, nor did Dr. Bunney record even the subjective complaint of pain consistent with fibromyalgia. By comparison, in June 2010 Nowak complained of "symptoms of head congestion, sore throat, and drainage at the back of the throat. She is fatigue [sic] and tired. She has anxiety and insomnia. (Tr. 281). Nowak's complaint of fatigue provides some, albeit weak, evidence upon which to base the suspicion of fibromyalgia. Yet Dr. Bunney's diagnosis from that visit includes only insomnia, fatigue, anxiety, and a rule out diagnosis of hypothyroidism, and makes no mention of fibromyalgia. (*Id*.).

Even where Dr. Bunney recorded "symptoms of fibromyalgia," his records generally do not include reference to said symptoms. He does not, for instance, provide detail about whether Nowak experienced tender points, nor does he correlate somatic or co-occurring conditions which might suggest fibromyalgia. Fatigue is referenced numerous times in Dr. Bunney's records (*see, e.g.*, Tr. 161, 162, 168, 175, 186, 214, 219, 221, 225), but nowhere does Dr. Bunney conclude that this symptom was the product of fibromyalgia. Insomnia likewise appears in the record on a regular basis (*see, e.g.*, 162, 168, 174, 193), yet it is never discussed in the context of fibromyalgia. Back pain also makes numerous appearances, but the reader is generally left to guess whether that symptom is likely the product of fibromyalgia or some other condition. (*See, e.g.*, 174, 179, 180, 194, 201, 207, 213). On the rare occasion when Dr. Bunney explicitly considers the cause of Nowak's back pain, the inciting factor is something other than fibromyalgia. (*See* Tr. 277 back pain caused in July 2010 by "carrying lots of rocks through [her] yard;" Tr. 266 back pain caused

in January 2011 by "playing with her daughter and [the daughter] jumped on [Nowak's] back and [Nowak] fell and hurt her chest.").

Perhaps most notably, despite several years of repeated (often monthly) complaints of pain, anxiety, insomnia, fatigue, arthritis, abdominal pain, back pain, scoliosis, and other issues, Dr. Bunney did not refer Nowak to a specialist, nor did he suggest application of any non-conservative treatment. Particularly where Nowak asserts that her pain is so severe that it cannot be measured on a ten point scale, it is reasonable to expect that Dr. Bunney would refer Nowak to a pain management specialist, fibromyalgia specialist, or other specialist physician who could more satisfactorily address her various complaints of pain.

Dr. Bunney's diagnoses thus suffer from a chronic deficiency of evidentiary support. It may well be that Nowak suffers from significant pain resulting from fibromyalgia, but Dr. Bunney's records provide weak support at best for that conclusion. The Sixth Circuit has determined that insofar as a physician's opinion merely "regurgitates" a patient's "self-described symptoms," it is not an opinion at all. *See Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011). As noted above, a physician's opinion is entitled to controlling weight only where it is ""well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(d)(2). In this case, Dr. Bunney's treatment notes are brief and unexplained, and his conclusions regarding fibromyalgia do not appear to be supported by any diagnostic techniques at all. The extreme degree of work restriction proposed in Dr. Bunney's opinion is thus draws little support from his treatment notes. The ALJ decision to give little weight to Dr. Bunney's opinion was supported by substantial evidence. *See* (Tr. 18); *Buxton v.*

24

*Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.") (quotation omitted).

### 2.    The ALJ Was Not Required to Recontact Dr. Bunney

Nowak also asserts that "even if the clinical findings [of Dr. Bunney] were inadequate, it was the ALJ's duty to seek additional information from Plaintiff as to the nature of her relation with her doctor." (Doc. 9 at 14). ALJs are required to "recontact a medical source only if the evidence received from that source is 'inadequate' for a disability determination." *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. App'x 411, 416 (6th Cir. 2006). An ALJ is not required to recontact medical source merely because he or she finds that the source's opinions are not well supported by the evidence. Instead, the duty to recontact arises only where there is some deficiency in the provided evidence that could be corrected by recontacting the source to obtain the missing evidence. There is no indication that the ALJ found that Dr. Bunney's notes were damaged, difficult to read, or otherwise missing such that recontacting that physician would benefit Nowak's case for benefits. The ALJ therefore did not err by declining to recontact Dr. Bunney.

### 3.    The ALJ's Decision to Treat Fibromyalgia as a Non-Severe Condition is Legally Irrelevant

Nowak next complains that the ALJ did not consider fibromyalgia to be a severe impairment at Step Two of the sequential evaluation process. (Doc. 9 at 17). Once the ALJ found that Nowak suffered from at least one severe impairment at Step Two, he was obliged to consider the cumulative effects of all of her severe and non-severe impairments,

rendering his finding that fibromyalgia was not a severe impairment "legally irrelevant." *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008). No cause for remand can be found here. Insofar as Nowak might be understood to argue that the ALJ's RFC assessment is flawed by his finding at Step Two, the Court points to the analysis in section one of this analysis, and notes that Dr. Bunney's severe limitations draw little support from his unsupported and largely unremarkable treatment notes.

### 4.      The ALJ's Credibility Determination was Supported by Substantial Evidence

Nowak also argues that the ALJ erred by discounting the credibility of her allegedly disabling symptoms. (Doc. 9 at 19). Specifically, she asserts that fibromyalgia is a condition which does not produce objectively determinable symptoms, thus the lack of objective findings supporting her alleged pain and fatigue resulting from fibromyalgia should not malign the credibility of her complaints. (*Id*.). Nowak also notes that she has expressed the desire to return to work, and that she has consistently sought treatment for her conditions, factors which she argues ought to bolster the credibility of her self-reported symptoms. (*Id.* at 21).

As noted above, credibility determinations are the province of the ALJ, and should be disturbed only for a compelling reason. The ALJ discounted the credibility of Nowak's subjective complaints by reference to several factors, including her activities of daily living, the consistency of her subjective complaints with the medical evidence of record, the degree of treatment which Nowak sought and received, her treatment history, and her work history.

The ALJ explicitly considered both Nowak's work history, which he considered "to her credit" (Tr. 18), and her full treatment history, which he addressed in detail throughout the decision (Tr. 13-19). Nevertheless, the ALJ found that these factors could not outweigh the dearth of "support [for] the allegations of disabling symptoms absent objective medical evidence." (Tr. 18). Having found that the objective evidence does not support Nowak's asserted degree of disability, the ALJ was then required to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ found that Nowak's daily activities were inconsistent with her stated degree of limitation. (Tr. 18-19). He noted Nowak's admission that she could drive, perform personal care activities, attend church, teach a course at church, read, perform basic gardening, and spends much of her time on the phone. (Tr. 18). While Nowak testified in 2013 that her gardening activities mostly consist of watching her husband tend to the flowers (Tr. 119), her medical records reveal that she was carrying stones through at least July 2010 (Tr. 277), inconsistent with her alleged onset date of April 2009.

Nowak's other activities of daily living, while not particularly strenuous, nevertheless appear to conflict with the allegedly unfathomable nature of her pain. Nowak's complained of "constant," "twelve out of ten" pain, neck pain consistent with a

terrorist attack that killed nearly three thousand Americans, and described her pain as feeling like "glass throughout [her] entire body." (Tr. 28). Dr. Bunney opined that Nowak's pain would "constantly" interfere with her work. (Tr. 339). It is therefore difficult to understand how Nowak is nevertheless able to concentrate sufficiently to teach a course to children at church, watch the news "all day," read scripture, visit ill persons in the hospital, or perform various other activities which require substantial concentration. (Tr. 33, 119).

The Court also notes that Nowak's testimony at the hearing before the ALJ was so extreme that it invites the conclusion that she exaggerated. The ALJ asked Nowak to characterize her pain on a ten point scale, with a "ten" meaning pain so severe that one would have to "go to the hospital." (Tr. 28). Nowak asserted that her pain was "constant," and claimed that she experienced pain at a level of "like 12" out of ten. (*Id.*). Despite allegedly experiencing pain two points greater than the upper bound of the scale, there is no medical record indicating that Nowak sought care at a hospital. She was also able to concentrate despite that allegedly debilitating pain sufficiently well to complete the hearing without further complaint. Further, the September-Eleventh-like neck pain to which Nowak attested at the April 2009 hearing before the ALJ makes little appearance in the medical record (*see* Tr. 219), despite regularly seeking medical attention for other ailments varying from abdominal pain (Tr. 158, 206) to back pain (Tr. 174, 179, 180, 194, 201, 207, 213), to scoliosis (Tr. 191).

In sum, the medical evidence of record does not support Nowak's asserted level of debility, and her own allegations of extreme pain are inconsistent with her activities of daily living. In light of these substantial discrepancies, Nowak's consistent work history

and regular medical checkups cannot salvage the credibility of her subjectively reported symptoms. The ALJ did not err in discounting Nowak's credibility.

### 5.      The ALJ Properly Evaluated Nowak's Pain and Fatigue

Finally, Nowak argues that the ALJ failed to "consider[] the effect of the Plaintiff's impairments including her subjective complaints of pain and fatigue." (Doc. 9 at 21). Nowak notes that she complained of "horrible pain," requires daily naps, is "always tired," has four "bad days" per week, and has "problems with profound fatigue." (*Id.* at 22). She asserts that the ALJ should have included these restrictions in his questions to the VE, and that his failure to do so undermines the evidence produced by the VE's answers. (*Id.*).

The ALJ explicitly considered Nowak's alleged severe and unresolved pain (Tr. 15-16) and her fatigue, including her allegedly limited ability to walk, sit, and stand (Tr. 16). The ALJ did not, however, uncritically accept Nowak's subjective complaints as the truth and include them in his hypothetical questions to the ALJ. Nor was he required to do so. *See Jones*, 336 F.3d at 476. As discussed above, the ALJ considered the credibility of Nowak's subjectively reported symptoms in the light of her medical records, activities of daily living, and other factors, and found little support for her asserted degree of limitation. He therefore included in his RFC assessment and related hypothetical questions to the ALJ only those limitations which he found supported by the record, which is to say a restricted range of light work. (Tr. 14). The ALJ's decision not to incorporate all of Nowak's subjective complaints into the hypothetical question to the VE was thus well supported. The ALJ's decision is therefore supported by substantial evidence.

**H.      Conclusion**

For the reasons stated above, the Court **RECOMMENDS** that Nowak's Motion for Summary Judgment (Doc. 9) be **DENIED**, the Commissioner's Motion (Doc. 10) be **GRANTED**, and that this case be **AFFIRMED**.

**III.      REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  November 28, 2016                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


**<u>CERTIFICATION</u>**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.


Date: November 28, 2016                    By s/Kristen Castaneda
                                            Case Manager